## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DATASCAPE, INC.,                           )
    a Georgia Corporation,             )
                                     )
    Plaintiff,                         )
                                       )
v.                                         )          Civil Action File No.:
                                       )          1:09-CV-0136-CC
SPRINT SPECTRUM, L.P.                      )
    a Delaware Limited Partnership,    )          **JURY TRIAL DEMANDED**
                                       )
and                                        )
                                       )
SPRINT SOLUTIONS, INC.                     )
    a Delaware Corporation,            )
                                       )
    Defendants.                        )
_____)

**PLAINTIFF DATASCAPE, INC.'S RESPONSE TO DEFENDANTS SPRINT
SPECTRUM, L.P. AND SPRINT SOLUTIONS, INC.'S OBJECTIONS TO
THE SPECIAL MASTER'S REPORT AND RECOMMENDATION ON
CLAIM CONSTRUCTION REGARDING U.S. PATENT NOS. 5,742,845,
5,905,908, 6,366,967, 6,684,269, AND 6,745,259**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. BACKGROUND ..................................................................................................2

    A. The Patents-in-Suit ......................................................................................2

    B. Procedural History ......................................................................................3

III. ARGUMENT ......................................................................................................4

    A. The Special Master Properly Applied the Principles of Claim
       Construction ................................................................................................4

       1. The Special Master Properly Construed the Disputed
          Claim Terms in Light of the Specification ...........................................5

       2. The Special Master Construed "Coined Terms"
          According to Proper Claim Construction Principles ............................7

    B. The Special Master Correctly Construed the Disputed Claim
       Term "Extended Open Network Protocol" ................................................10

       1. The Claim Language Supports the Special Master's
          Construction .......................................................................................12

       2. The Specification Supports the Special Master's
          Construction .......................................................................................13

       3. The Prosecution History Supports the Special Master's
          Construction .......................................................................................15

       4. Additional Briefing, as Requested by Sprint, is
          Unnecessary .......................................................................................17

    C. The Special Master Correctly Construed the Disputed Claim
       Term "Non-Standard I/O Device" .............................................................20

1.   The Specification Supports the Special Master's Recommended Construction ............................................. 22

2.   Sprint's Proposed Construction Is Not Tied to the Specification and Thus Was Properly Rejected By the Special Master ..................................................................... 23

3.   Sprint's Objections To the Special Master's Construction Lack Merit .................................................................. 26

C.   The Special Master Correctly Construed the Disputed Claim Term "Telephone" and Thus Sprint's Objections Should Be Rejected ................................................................................. 28

D.   The Special Master Properly Construed the Disputed Term "Screen Phone" and Thus Sprint's Objections Should Be Rejected ................................................................................. 31

E.   The Special Master Properly Declined to Construe Several Phrases From the Patents-in-Suit ................................................ 33

F.   The Special Master's Recommended Constructions Do Not Impermissibly Broaden the Scope of Disputed Claim Terms ............ 35

G.   The Special Master Correctly Construed the Disputed "Client Program . . ." Phrases .................................................................. 36

H.   The Special Master Properly Construed the Disputed "Means For" Claim Phrases .................................................................. 41

IV.   CONCLUSION ................................................................................. 44

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Labs., v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009)     5, 34

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
   659 F.3d 1121 (Fed. Cir. 2011)     10

*Acumed LLC v. Stryker Corp.*,
   483 F.3d 800 (Fed. Cir. 2007)     33, 36

*Apex, Inc. v. Raritan Computer, Inc.*,
   325 F.3d 1364 (Fed. Cir. 2003)     39

*Finisar Corp. v. DirecTV Grp., Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008)     44

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
   91 F.3d 1580 (Fed. Cir. 1996)     39

*Intervet Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010)     7

*Liebel-Flarsheim Co. v. Medrad*, Inc.,
   358 F.3d 898 (Fed. Cir. 2004)     5

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967, 979 (Fed. Cir. 1995)     14, 22

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
   161 F.3d 696 (Fed. Cir. 1998)     39

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)     6, 12, 13, 14, 16, 22, 27, 29

*Renishaw PLC v. Marposs Societa' per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998)     13

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001)     6

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985)     27

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
   659 F.3d 1376 (Fed. Cir. 2011)     44

*Watts v. XL Sys., Inc.*,
   232 F.3d 877 (Fed. Cir. 2000)     40

*WMS Gaming Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)     42

**Statutes**

35 U.S.C. § 112(6)     39, 40

## I.    INTRODUCTION

Defendants Sprint Spectrum, L.P. and Sprint Solutions, Inc. (collectively "Sprint") object to the Special Master's Report and Recommendation on Claim Construction Regarding U.S. Patent Nos. 5,742,845, 5,905,908, 6,366,967, 6,684,269, and 6,745,259 (Dkt. No. 71, hereinafter the "Claim Construction R&R"), erroneously asserting that "the Special Master's recommendations reflect plain legal and factual error."   Dkt. No. 83 at 1.   On the contrary, the Special Master's thorough and well-reasoned recommendations are the result of a careful analysis of the intrinsic and extrinsic evidence of record and application of appropriate principles of claim construction law, and therefore should be adopted. Defendant Sprint, however, urges this Court to disregard the Special Master's recommended constructions and instead adopt Sprint's proposed constructions. The constructions proffered by Sprint are not only inconsistent with the specification of the patents-in-suit, but also ignore binding legal authority concerning claim construction.   Accordingly, because the Special Master properly construed the disputed claim terms, and because Sprint's objections lack any legitimate basis in law or fact, Defendant Sprint's objections to the Claim Construction R&R should be overruled.

## II.    BACKGROUND

### A.    The Patents-in-Suit

Plaintiff Datascape is the owner of the five patents-in-suit, which all share the same specification.  The invention of the patents-in-suit is drawn to systems and methods that extend open network protocols to support communication over open networks with non-standard I/O devices.  Prior to the invention of the patents-in-suit, non-standard I/O devices (*e.g.*, PDAs, screen phones, smart card readers, magnetic stripe readers, etc.) were unable to communicate effectively over the Internet because of the limitations of the then-available open network protocols.  The invention claimed by the patents-in-suit addressed this issue by extending open network protocols in such a manner that they supported communication with non-standard I/O devices over an open network.  *See* JX-1, '845 Patent at Col. 3, lines 40-44.[1]

Significantly, Datascape's invention is not concerned with modifying or improving the capabilities of any particular I/O device, either standard or non-standard.  Instead, the invention is primarily directed to modifying protocols to support communication.  As the Special Master explained, "'the invention'

[1] The abbreviation "JX" is used to refer to "Joint Exhibits" filed jointly by the parties, and can be found at Docket No. 38 (Notice of Filing of Joint Exhibits). Additionally, unless otherwise noted, all citations to the specification of the '845 Patent can also be found in the specifications of the other patents-in-suit.

addressed, *inter alia*, the inability of then extant open network protocols to 'read' data from, *inter alia*, magnetic stripe readers . . . ."  Dkt. No. 71, Claim Construction R&R at 99.[2]  The extended open network protocols of the invention "provide[] protocols and formats for standard input/output (I/O) operations of non-standard I/O devices, thus enabling non-standard I/O devices to communicate with a server 'as if the non-standard device were a PC on the network.'"  Dkt. No. 71, Claim Construction R&R at 123.

### B.    Procedural History

On October 8, 2009, the Court appointed Mr. Gale R. Peterson as special master "to supervise claim construction discovery proceedings, preside over the *Markman* hearing in this action, and submit a report and recommendation on claim construction to the Court."  Dkt. No. 42 at 1-2.  The parties submitted opening claim construction briefs on September 25, 2009, and responsive briefing was filed on October 15, 2009.  Dkt. Nos. 40, 41, 44 and 45.  Special Master Peterson held a *Markman* hearing on October 22, 2010, affording all parties a full and fair opportunity to be heard.

On November 30, 2011, Special Master Peterson issued his detailed and thorough report and recommendations in the Claim Construction R&R, which

---

[2] All references to page numbers of the Claim Construction R&R are to internal page numbers, <u>not</u> the docket page number.

totals more than 350 pages.  Dkt. No. 71, Claim Construction R&R.  Specifically, the Claim Construction R&R provides recommended constructions for thirty-five disputed claim terms, nearly all of which comport with the constructions proposed by Datascape.  On January 19, 2012, Datascape filed a motion to adopt thirty-three of the Special Master's recommended constructions, and moved for adoption with modification of the remaining two recommended constructions.  Dkt. No. 80. Defendant Sprint, on the other hand, filed objections to all of the Special Master's recommendations.  Dkt. No. 83.

## III.   ARGUMENT

### A.   The Special Master Properly Applied the Principles of Claim Construction

As an initial matter, Sprint's assertion that "the Special Master used incorrect rules of claim construction" is flatly false.  Dkt. No. 83 at 10.  On the contrary, the claim construction rules cited by the Special Master and employed throughout his report represent well-established, fundamental principles of claim construction law and were properly applied.  Even a cursory review of the Claim Construction R&R demonstrates that Sprint's contentions lack merit, and that the legal principles applied by the Special Master were proper and valid.

**1.      The Special Master Properly Construed the Disputed Claim Terms in Light of the Specification**

Sprint first alleges that the Special Master "improperly minimize[d] the role of the patent specification" by utilizing the two following claim construction principles when construing the disputed claim terms: "(1) claims are read in light of the specification, but (2) *limitations must not be read into the claims*."  Dkt. No. 83 at 10 (quoting Claim Construction R&R at 11) (emphasis added by Sprint). According to Sprint, the legal principles employed by the Special Master are outdated and invalid, as "more recent Federal Circuit case law has held that claims may indeed by limited to particular embodiments disclosed in patent specifications."  Dkt. No. 83 at 10.  Sprint's erroneous assertion, however, is based on a clear mischaracterization of the relevant case law.

As the Federal Circuit has explained, "the twin axioms regarding the role of the specification in claim construction" are that "claims must be read in view of the specification, of which they are a part," but also that "it is improper to read a limitation from the specification into the claims."  *Liebel-Flarsheim Co. v. Medrad*, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004) (internal citations and quotations omitted).  Indeed, the Federal Circuit has confirmed on numerous occasions that limitations from the written description should not be read into the claims.  *See, e.g.*, *Abbott Labs., v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("When

consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification."); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).

Sprint's assertion that the Special Master "used incorrect rules of claim construction" because he cites binding legal precedent that limitations are not to be read into the claims simply defies logic.  The claim construction principles cited by the Special Master and applied throughout his report are clearly valid, and a failure to abide by them would certainly have been error.  Moreover, the Special Master's report contains an expansive explanation of the legal principles that guide claim construction, including several pages devoted to the importance of the specification in claim construction.  *See* Claim Construction R&R at 10-12 ("[C]laims must be read in view of the specification, of which they are a part. . . . [T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the singly best guide to the meaning of a disputed term." (internal citations and quotation marks omitted)).  Furthermore, as described, *infra*, the Special Master consulted the specification extensively throughout his claim construction analysis, further undermining Sprint's claim that the role of the specification was

"improperly minimize[d]."   Accordingly, Sprint's allegation lacks any legitimate foundation.

### 2.   The Special Master Construed "Coined Terms" According to Proper Claim Construction Principles

Defendant Sprint also asserts that the Special Master erred by failing to correctly apply the rules of claim construction when construing "coined terms." Dkt. No. 83 at 12.   According to Sprint, the Special Master failed "to provide any discussion regarding the role of the specification in construing 'coined terms.'"   *Id.* at 12.   However, the Special Master's report relies heavily on the intrinsic evidence of record, and in particular the specification, when construing the disputed coined terms, thereby demonstrating that Sprint's allegation is groundless.

The Federal Circuit has explained that "[t]erms coined by the inventor are best understood by reference to the specification.   Such understanding is informed, as needed, by the prosecution history, if it is in evidence."   *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010).   As the Special Master acknowledged, several of the disputed claim terms, including "extended open network protocol" and "non-standard I/O device," are coined terms.   Claim Construction R&R at 42, 145.   When analyzing these coined terms, the Special Master repeatedly and appropriately looked to the specification and prosecution history for guidance.

For example, when construing the term "extended open network protocol" the Special Master included a section entitled "Claim Language and Specification" and noted that the specification "consistently" used the language proffered by Datascape.  Claim Construction R&R at 56.  The Special Master also explained how the specification supported his analysis, stating

> [t]hat also finds support from other portions of the specification.  The specification explains, for example, that "[t]he system of the present invention is implemented by extending present open network communication protocols and data message formats to communicate with non-standard I/O devices either coupled to an open network as a client or coupled to an open network through a client, such as a PC, credit card terminal, screen phone, or PDA."  '845 patent, col. 5, lines 48-53.

Claim Construction R&R at 106 (quoting the specification of the patents-in-suit) (emphasis added by the Special Master).  In fact, the Special Master's claim construction analysis of the disputed coined terms is overflowing with explanations of how the specification of the patents-in-suit supports his recommendations – and also of why the specification does not support the constructions proffered by Sprint.  *See, e.g.*, Claim Construction R&R at 56, 68-86, 93, 106, 108 (referring to the specification when analyzing the coined term "extended open network protocol"); Claim Construction R&R at 104-05 (explaining that Sprint's proposed construction of "extended open network protocol" is inconsistent with the invention disclosed in the specification); *see also* Claim Construction R&R at 122-

23 (examining the file history and explaining how statements made during prosecution support the recommended construction of the coined term "extended open network protocol"). There is simply no basis for Sprint's claim "that the Special Master's claim constructions do not take into proper account the express teachings of the patent specification . . . ." Dkt. No. 83 at 13. To the contrary, and as further explained *infra*, the Special Master's recommended claim constructions for the coined terms are based on the intrinsic evidence of record, and are therefore proper.

Accordingly, Sprint's contention that there are "substantial errors in the Special Master's application of the rules of claim construction to the claims at issue" is simply incorrect. The Special Master's analysis relies on valid and sound legal principles and applies these principles properly to arrive at the recommended constructions.

Additionally, Sprint's allegation that the Special Master's recommendations lack legitimacy because he may "feel a vested interest in bolstering the credibility of his prior work" is startling. The Court appointed Special Master Peterson because "the issues relating to claim construction in this case are complicated." Dkt. No. 42 at 1. Indeed, "[a] primary purpose of appointing a special master is to narrow the issues before the district court judge to facilitate an efficient and timely

resolution of complex or highly-technical issues, such as patent claim construction." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1131 (Fed. Cir. 2011).  Special Master Peterson has been working with the patents-in-suit since 2004, serving as Special Master in several *Datascape*-related cases.  As is evident from his Report and Recommendation, Special Master Peterson clearly understands the complexity of the technology at issue and is well-acquainted with the specification of the patents-in-suit.  If anything, the duration and thoroughness of Special Master Peterson's work is all the more reason to respect and value his recommendations.

**B.    The Special Master Correctly Construed the Disputed Claim Term "Extended Open Network Protocol"**

Defendant Sprint objects to the Special Master's recommended construction of the term "extended open network protocol."  The parties proposed constructions of the term "extended open network protocol" are:

| DATASCAPE'S PROPOSED CONSTRUCTION | SPRINT'S PROPOSED CONSTRUCTION | SPECIAL MASTER'S RECOMMENDED CONSTRUCTION |
|---|---|---|
| An open network protocol published or publicly available at the time of the filing date of the '845 patent (June 22, 1995), or earlier, that has been extended by making additions to that protocol | An open network protocol that was published or publicly available prior to the filing date of the '845 patent, namely June 22, 1995, that has been extended by making additions to that protocol | An "extended open network protocol" is an open network protocol published or publicly available at the time of the filing date of the '845 patent (June 22, 1995), or earlier, that has been |

| in order to support communication between a server and a non-standard I/O device. | in order to permit a server to communicate with a non-standard I/O device. | extended by making additions to that protocol in order to support communication between a server and a non-standard I/O device. |
|---|---|---|
| | | The term "support" means providing protocols and formats for the standard I/O operations of a "non-standard I/O device." |
| | | Changes that constitute deletions for obsolete features that are made to an "open network protocol published or publicly available at the time of the filing date of the '845 patent (June 22, 1995), or earlier" do not result in a "new" protocol, but rather a revised protocol. |

As both Sprint and the Special Master note, the primary dispute concerns whether the language "to support" or "to permit" should be used in the construction of "extended open network protocol."  Claim Construction R&R at 45; Dkt. No. 83 at 17.  The Special Master's recommended construction, which uses the language "to support," correctly comports with the language of the claims, the teachings of the

specification, and the prosecution history of the patents-in-suit, and thus Sprint's Rule 53 objection should be overruled.

### 1.    The Claim Language Supports the Special Master's Construction

The Special Master's recommended construction is supported by the language of the claims of the patents-in-suit.  In determining the meaning of disputed claim terms, the court looks to the words of the claims.  *See, e.g.*, *Phillips*, 415 F.3d at 1314 ("Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms.").  As the Special Master correctly recognized, the claims of the patents-in-suit clearly use the word "support" when describing an "extended open network protocol."  *See* Claim Construction R&R at 87 ("[T]hroughout the claims, 'support' is used in the environment of an 'extended open network protocol' . . . that 'supports' 'communications' with a 'non-standard I/O device.'"); *id.* at 98 ("[T]he claim language, 'extended open network protocol that supports communication with non-standard I/O devices,' uses the term 'supports.'").  Thus, the claims themselves require that the extended open network protocol support – not permit – communication with non-standard I/O devices.

Sprint's assertion that its proposed construction "makes more sense and is in line with Federal Circuit case law" is wrong.  Dkt. No. 83 at 21.  As the Federal

Circuit has explained, claim construction "begins and ends" with the actual words of the claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).   To adopt Sprint's construction that extended open networks "permit," rather than "support," communication would be to, in effect, strike the word "support" in the claims and replace it with "permit."[3]   The applicable legal authority simply does not allow such a rewriting of the claim language. Accordingly, the language of the claims comports with the Special Master's recommended construction – and not Sprint's proposed construction.

### 2.   The Specification Supports the Special Master's Construction

The Special Master's recommended construction is also supported by the specification of the patents-in-suit.   "Claims 'must be read in view of the

---

[3]   Furthermore, Sprint's assertion that the Special Master's recommended construction is "circular" is simply illogical.   Dkt. No. 83 at 18-21.   By using the phrase "to support" in the construction of "extended open network protocol," the Special Master did not use the term being defined as part of the definition – which generally results in circularity.   Sprint's actual argument appears to be that the proper construction of a disputed claim term should *avoid* using words or language from the claims.   This argument is contrary to established legal authority and therefore must fail.   *Phillips*, 415 F.3d at 1314; *Renishaw PLC*, 158 F.3d at 1248 (noting that claim construction "begins and ends" with the words of the claims). The purpose of claim construction is to ensure that the trier of fact understands what is covered by the patent claims as construed, and the Special Master's recommended constructions clearly achieve this goal.   *Power-One, Inc. v. Artesyn Tech., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'").

specification, of which they are a part.'"   *Phillips*, 415 F.3d at 1315 (quoting

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).   The

specification consistently uses the word "support" when describing the function of

the extended open network protocol.   *See* JX-1, '845 Patent at col. 5, lines 37-47;

'845 Patent at col. 5, lines 53-58; '845 Patent at col. 11, lines 21-24.   Indeed, the

word "support" is used thirty-five times in the specification, most frequently in

describing the purpose and function of the extended open network protocol.   The

Special Master properly recognized this, and construed "extended open network

protocol" in accordance with the teachings of the patent specification.   *See* Claim

Construction R&R at 56 ("The specification . . . consistently uses 'support' (and

'supported' and 'supporting') when discussing the 'extended open network

protocol.'"); *id.* ("[T]he claims and specification clearly use the word 'support' and

it is not the province of the Court to rewrite the claims (or the specification)."); *id.*

at 106 (explaining that Sprint's understanding of "support" is contradicted by the

specification and that the specification supports the Special Master's

understanding).

Defendant Sprint's claim that "the specification consistently uses 'to permit'

in describing the purpose of the invention" is not only incorrect, but was rejected

by the Special Master.   Dkt. No. 83 at 21.   The Special Master explained that,

while the specification does occasionally use the word "permit," it never does so "in conjunction with discussing the 'extended open network protocol.'"[4]  *Id.* at 56. *See e.g.*, JX 1, '845 Patent at col. 5, lines 48-58 (discussing the invention, stating that "additions are made to commands implemented within the control structure of that existing protocol ***to support non-standard I/O device communication***" (emphasis added)); id. at col. 11, lines 47-54 (noting that certain attributes "have previously been ***unsupported*** in any Internet protocol" (emphasis added)).  Sprint's use of the word "permit" is not supported by the specification.   Thus, the specification supports the Special Master's recommended construction, rather than Sprint's proposed construction.

> ### 3.    The Prosecution History Supports the Special Master's Construction

---

[4] Additionally, Sprint's suggestion that the Special Master used the word "permit" when construing "extended open network protocol" in a previous claim construction report and recommendation because the specification called for "permit," rather than "support," is inaccurate.  Dkt. No. 83 at 22-23.  While the Special Master did use "permit" in his recommended construction of "extended open network protocol" in the *Datascape v. Kyocera Wireless Corp.* action, the Special Master expressly noted in the Datascape-Sprint II R&R that "[t]he present issues surrounding 'support' versus 'permit' were not argued or addressed" in *Datascape v. Kyocera Wireless Corp.* case.  Datascape-Sprint II R&R at 55.  Thus, the Special Master has not previously determined that the specification suggests "permit" rather than "support," and Sprint's argument that the Special Master's recommended construction is somehow incorrect because it departs from his "original construction" is irrelevant.

In arriving at his recommended construction, the Special Master also consulted the prosecution history of the patents-in-suit and correctly determined that the file history supports his recommended construction. When construing claim terms, the court should "consider the patent's prosecution history, if in evidence. . . . [T]he prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. The Special Master analyzed portions of the prosecution history extensively in an effort to determine what the inventor intended when distinguishing the invention of the patents-in-suit from prior art. *See* Claim Construction R&R at 117-23. Moreover, the prosecution history was discussed extensively during the *Markman* hearing. Specifically, Sprint cited to a portion of the prosecution history to justify its use of the word "permit" instead of "support." *Markman* Hearing Transcript, 135:18-136:10. As Datascape explained at the *Markman* hearing, Sprint misconstrued the statements in the prosecution history, reading them out of context:

> It's our position that's inappropriate because what the expression, that "enabling communication that otherwise wouldn't exist," it's not enabling a device to have any communications whatsoever. When that sentence is read in the context of the specification, the common specifications of all these patents, what we learn, and what Mr. Wagner told us in that specification, is that this invention enables types of communications that would otherwise not exist.
>
> . . .

> The  . . . reason that "support" is appropriate and "permit" is not appropriate, [is] because the hook that Sprint is trying to hold on to, this "enables communications that otherwise wouldn't exist," from the prosecution history, isn't talking about permitting a device to communicate and it couldn't communicate at all before; it's talking about enabling types of communications that otherwise wouldn't exist, similar to the example that I gave you, like communications that send information in a format that, for example, a device with a small screen can use more efficiently, more appropriately for that device.

*Id.* at 10:19-11:1; 11:22-12:7.

Having thoroughly reviewed the prosecution history, the Special Master correctly concluded that Sprint's characterization of the prosecution history was inaccurate, and that the prosecution history indicates "the inventor used 'support' in the sense that 'extended open network protocols' provided protocols and formats for standard input/output (I/O) operations of non-standard I/O devices, as opposed to permitting communication *per se*." *Id.* at 122. Thus, the Special Master properly analyzed the prosecution history and determined his recommended construction is consistent with the intrinsic evidence.

### 4. Additional Briefing, as Requested by Sprint, is Unnecessary

Finally, Sprint's request for an additional briefing schedule is, in actuality, a thinly-veiled attempt to prolong the claim construction process and delay ultimate resolution of this matter, and should therefore be denied. Sprint claims that a separate briefing schedule is needed to address the use of certain terms, such as

"deletions," "new protocol," and "revised protocol," in the Special Master's recommended constructions.  However, it was Sprint itself who raised these issues in its claim construction briefing when discussing the proper construction of the work "extended."   See Dkt. No. 44 at 8 ("To the extent that Datascape, by this convoluted argument, is trying to shoehorn its prior definition of 'extended,' as including 'changes,' this must be rejected.   Indeed, Datascape's true purpose is perhaps revealed by its use of the term 'modified' in its proposed definition.  The term 'modified' could be understood to include **making changes or deletions** to something like a protocol." (emphasis added)).   Moreover, the parties had ample opportunity to discuss these terms at the *Markman* hearing.  Sprint's own expert, Mr. Holtzman, testified at length on this issue:

Q. ***What is your opinion concerning the issue of <u>deletions</u>?***

A. Well, I think that the specification makes it clear that an extended open network protocol, which is a term that Wagner clearly coined, the applicant, is an existing protocol, an open network protocol to which you make additions. And I think all of this discussion about, you know, the normal process of protocol development, we remove things, we change things, it's still the same protocol, I would take exception to that.

***I would say that that's actually coming up with <u>new protocols, that a new version of a protocol is a new protocol</u>.***

And that quite clearly, you know, there's these issues of backwards compatibility that were raised exactly because ***<u>it's a new protocol</u>***. Some protocols contemplate backwards compatibility with previous

versions and some don't. So I think, really, they are not all the same thing.

It's not just this protocol has changed in some way and it's still the same protocol. We now have another protocol to consider.

*Markman* Hearing Transcript, 131:1-18 (emphasis added); *see also id.* at 54:2-56:2

(testimony from Datascape's expert explaining the distinction between new and

extended protocols). In fact, Sprint's own expert expressly suggested the language

that the Special Master included in his recommended construction:

THE SPECIAL MASTER: Okay. Actually I'm asking you these questions in the context of you being one of ordinary skill in the art who has, and I understand this is a coined term, but who has read the patent prosecution history and all the stuff that you have done. That's the context that I'm asking the question.

MR. HOLTZMAN: Right. So in general, you know, when one would go from like a HTML 1.0 to HTML 2.0, ***you might use the word "revised" but you wouldn't use the word "extended"*** unless you really did just put more things in. ***That's why they call it a version, a revision.*** So I don't think they're the same thing.

*Markman* Hearing Transcript, 132:21-133:7 (emphasis added). Sprint cannot now

complain about the fact that the Special Master adopted the language suggested by

its own expert.

Likewise, Sprint's claim that additional briefing is needed to "determine

whether the language should be changed to more clearly comport with what a

reasonable person skilled in the art would have understood" lacks merit. Dkt. No.

83 at 24-25.   The parties' experts testified extensively on this matter at the *Markman* hearing.   *See Markman* Hearing Transcript, 49:8-56:24; *see also id.* at 128:23-133:25.   The testimony of both experts clearly addressed how one of ordinary skill in the art would have understood the issues concerning deletions and extended, new, and revised protocols.   *See Markman* Hearing Transcript, 52:12-21; *id.* at 56:6-24; *id.* at 132:21-133:1.  The Special Master had sufficient information on which to base his recommended construction, and therefore Sprint's demand for additional briefing on the terms included in the construction of "extended open network protocol" should be denied.

In conclusion, the Special Master's recommended construction of "extended open network protocol" comports with the intrinsic evidence of record.   Sprint's allegation that "the Special Master simply ignore[d] the evidence the law required him to consider" is patently inaccurate.   Accordingly, Sprint's Rule 53 objection should be overruled.

### C.   The Special Master Correctly Construed the Disputed Claim Term "Non-Standard I/O Device"

Defendant Sprint objects to the Special Master's recommended construction of the term "non-standard I/O device" and instead urges the adoption of its own proposed construction, even though Sprint's proffered construction is clearly

contradicted by the intrinsic evidence of record.   The parties proposed

constructions of the term "non-standard I/O device" are:

| DATASCAPE'S PROPOSED CONSTRUCTION | SPRINT'S PROPOSED CONSTRUCTION | SPECIAL MASTER'S RECOMMENDED CONSTRUCTION |
|---|---|---|
| An input/output device that (1) either interfaces to a computer through a communications port that was not normally used for networks as of June 22, 1995, or has limited input and output capabilities, and (2) was not supported by open network protocols published or publicly available as of June 22, 1995, or earlier. | A non-standard I/O device is a device that:<br><br>1) either provides input data other than QWERTY text, or cannot display any standard output device information received from a server, and;<br><br>2) was not supported by prior art open network protocols (e.g. HTTP/HTML) and could only communicate with a server through additions (subsequent protocols e.g., WAP/WML, or XML are not additions to prior art protocols) made to the prior art open network protocols. | The term "non-standard I/O device" means "an input/output device that (1) either interfaces to a computer through a communications port that was not normally used for networks as of June 22, 1995, or has limited input and output capabilities, and (2) was not supported by open network protocols published or publicly available as of June 22, 1995, or earlier."<br><br>The term "support" means providing protocols and formats for the standard I/O operations of a "non-standard I/O device."<br><br>Changes that constitute deletions for obsolete features that are made to an "open network protocol published or publicly available at the time of the filing date of the '845 patent (June 22, |

| | | 1995), or earlier" do not result in a "new" protocol, but rather a revised protocol. |
| --- | --- | --- |

The Special Master's recommended construction comports with the specification of the patents-in-suit, and is therefore correct. Moreover, the construction proffered by Sprint was properly rejected by the Special Master because it is inconsistent with the specification. Accordingly, Sprint's suggestion that its proposed construction should be adopted lacks merit, and Sprint's Rule 53 objections should be overruled.

## 1. The Specification Supports the Special Master's Recommended Construction

The Special Master's recommended construction comports with the specification of the patents-in-suit. "Claims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). The specification clearly defines "non-standard I/O device," explaining that:

> generally, non-standard I/O devices are devices which interface to a PC through a port not normally used for networks, such as a RS-232C port, or are devices which have limited input and output capabilities such as small screen displays or ten keypads. These devices are not supported on the Internet because servers use protocols that communicate with PCs supporting standard QWERTY keyboards and standard monitors.

*See* JX-1, '845 Patent at col. 4, lines 4-12.  The Special Master acknowledged the definition provided by the inventor in the specification, and his recommended construction properly corresponds with the teachings of the specification.  *See* Claim Construction R&R at 161.  As the Special Master explained, "the first sentence [of the definition provided in the specification] describes the physical characteristics of a 'non-standard I/O device,'" and "[t]he second sentence explains why those devices are not supported on the Internet." *Id.* at 162.  The construction recommended by the Special Master is consistent with the definition from the specification because the first sentence of the recommended construction describes the physical characteristics of a "non-standard I/O device," and the second sentence explains why "non-standard I/O devices" were not supported by open network protocols available as of June 22, 1995.  Thus, the Special Master's recommended construction is supported by the intrinsic evidence and is therefore correct.

> **2.    Sprint's Proposed Construction Is Not Tied to the Specification and Thus Was Properly Rejected By the Special Master**

Sprint acknowledges that "the Court must look to the specification" when construing coined terms, such as "non standard I/O device." Dkt. No. 83 at 30. However, as the Special Master noted, the construction proposed by Sprint is

wholly inconsistent with the specification of the patents-in-suit.  In the first clause of its proposed construction, Sprint attempts to define the difference between "standard I/O devices" and "non-standard I/O devices" on the basis of whether such a device "provides input data other than QWERTY text, or cannot display any standard output device information received from a server."  Claim Construction R&R at 161.  It is unclear what the term "QWERTY text" is intended to refer to, as the phrase does not appear in the patent and appears to have been coined by Sprint. Nor is it clear what Sprint means when it states that a non-standard I/O device "cannot display any standard output device information received from a server." This would seem to suggest that the device cannot display text at all, which is clearly contradicted by the specification.  *See* JX 1, '845 Patent, Figures 14-22B. The Special Master correctly recognized that the specification makes no such distinction.  *Id.*; *see also id.* at 162 ("The specification does not characterize 'non-standard I/O devices' as being unable to input or output 'QWERTY text.'") (emphasis in original).

Moreover, as Datascape has previously noted, Sprint's focus on "QWERTY text" as a defining feature of a non-standard I/O device ignores the definitions of non-standard I/O devices in the patent.  The specification clearly explains that a non-standard I/O device is one that (1) "interfaces[s] to a PC through a port not

normally used for networks" or (2) one that has "limited input and output capabilities."  JX 1, '845 Patent, at col. 4, lines 4-9.  Examples of such devices in the specification include credit card terminals, screen phone terminals, PDAs, bar code readers, magnetic card stripe readers, and smart card readers.  *Id.* at col. 9, line 60 – col. 10, line 9; col. 13, lines 13-19).  While such devices may be limited in their input/output capabilities in that they lack a QWERTY keyboard or a conventional screen display, they nevertheless typically generate, store, and/or display what the Defendants refer to as "QWERTY text" or "QWERTY-type text" character data.  Examples found in the patent specification include user names, passwords, credit card numbers, customer names, customer and shipping addresses, shipping information, account numbers, telephone numbers, and text messages.  *Id.* at Figures 13A – 23.  Under the Defendants' proposed construction, the exemplary devices of the patent specification would not be considered non-standard I/O devices, which simply defies logic.

Likewise, the second clause of Sprint's proffered construction lacks any basis in the specification of the patents-in-suit.  As the Special Master explained, "the specification does not disclose or require that 'non-standard I/O devices' could not otherwise 'communicate' with a server," and thus the inclusion of such a requirement in the construction would be inappropriate.  Claim Construction R&R

at 163.  Moreover, "Sprint does not point to any portion of the specification and/or prosecution history where Datascape has disclaimed or otherwise indicated that WAP/WML or XML are 'not additions to prior art protocols,'" and therefore this portion of the clause also lacks any foundation.

Consequently, because Sprint's proffered construction is contradicted by the specification of the patents-in-suit, the Special Master correctly rejected Sprint's construction.

### 3.      Sprint's Objections To the Special Master's Construction Lack Merit

Sprint's assertion that the Special Master's recommended construction is objectionable "because it makes the claimed limitation circular" is baseless.   By using the words "not supported" in the construction of "non-standard I/O device," the Special Master did not use the term being defined as part of the definition – which generally results in circularity.  The inclusion of the words "not supported" in the construction is entirely proper, as this is precisely the wording used by the specification to define a "non-standard I/O device."  *See* JX-1, '845 Patent at col. 4, lines 9-12 (noting that "non-standard I/O devices" were "***not supported*** on the Internet" or other open networks as of June 22, 1995) (emphasis added).

Furthermore, Sprint's contention that the Special Master's construction "cover[s] devices far outside the scope of the specification" is incorrect.  Dkt. No.

83 at 30.   As previously noted, Sprint's proposed construction would **exclude** examples of non-standard I/O devices that are listed in the specification.   The Special Master's recommended construction, on the other hand, is consistent with the definition of "non-standard I/O device" provided in the specification.   The examples of "non-standard I/O devices" included in the specification are just that – examples – and the scope of the claims is in no way limited to only those devices disclosed in the specification.     Sprint's criticism that the recommended construction "cover[s] all types of devices <u>not</u> included in the specification" reveals that Sprint's true aim is to improperly read limitations from the specification into the claims.   Dkt. No. 83 at 31 (emphasis in original).   Established Federal Circuit precedent clearly forbids this practice.   *See, e.g.*, *Phillips*, 415 F.3d at 1323.

Similarly, Sprint's suggestion that the "specification focuses on particular devices that existed as of June 22, 1995" and therefore, devices not in existence on that date are beyond the scope of the patents is contrary to established legal precedent.   Patents can and do encompass future technologies, even when they are not described in the specification.   *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*) ("The law does not require the impossible.   Hence, it does not require that an applicant describe in his

specification every conceivable and possible future embodiment of his invention."). In short, Sprint's objections are merely a thinly-veiled attempt to import limitations from the specification into the claims.

Accordingly, Sprint's Rule 53 objections have no legitimate basis in fact or law and should be overruled.

### C.     The Special Master Correctly Construed the Disputed Claim Term "Telephone" and Thus Sprint's Objections Should Be Rejected

The Special Master's recommended construction for the disputed claim term "telephone" comports with how one of ordinary skill in the art would have understood the term in 1995 and is consistent with the specification of the patents-in-suit, and is therefore correct. The parties proposed constructions of the term "telephone" are:

| DATASCAPE'S PROPOSED CONSTRUCTION | SPRINT'S PROPOSED CONSTRUCTION | SPECIAL MASTER'S RECOMMENDED CONSTRUCTION |
|---|---|---|
| A communication device that transmits and receives sound in the form of electrical signals. In the context of claims 9-15, 35, 38 & 41-42 of the '269 patent; and claims 97-104 of the '259 patent, an "extended Internet protocol" or "extended Internet protocol | A communications device that converts sound into electrical signals, transmits the electrical signals over a telephone network, and cannot communicate electrical signals not based on sound. | A "telephone" is a communication device that transmits and receives sound in the form of electrical signals. In the context of claims 9-15, 35, 38 & 41-42 of the '269 patent; and claims 97-104 of the '259 patent, an "extended Internet protocol" or "extended |

| statements" are used to provide communication with the "telephone." | | Internet protocol statements" are used to provide communication with the "telephone." |
| --- | --- | --- |

Claims are generally given their ordinary and customary meaning, which is defined as the meaning that a person of ordinary skill in the art would have given the term at the time of the invention. *Phillips*, 415 F.3d at 1312-13. One of ordinary skill in the art would have understood that, while a "telephone" transmits and receives sound in the form of electrical signals, it is not strictly limited this capability. *See* Claim Construction R&R at 198, 202. For example, the patent describes "[s]creen phone terminals [that] are devices which integrate a telephone with an ATM-like device and possibly a magnetic card swipe reader." JX 1, '845 Patent at col. 1, lines 28-30. Such devices "typically include a modem which converts the digital messages of the remote terminal into frequency modulated analog signals which may be transmitted over telephone lines to a modem at the central processing system." *Id.* at col. 2, lines 8-13. This screen phone terminal is a telephone, yet because it has ATM and magnetic card reader capabilities, it obviously communicates electrical signals that are not based on sound. Under Sprint's construction, this telephone described in the specification would be excluded from the claims.

In addition, the claims require, in some instances, that the telephone be coupled to the Internet or other open network, not a telephone network, and to be able to communicate data (not just sound) using extended Internet protocols or extended Internet protocol statements.    JX 7, '269 Patent, claim 9.    The specification also describes the communication of text, images, and other types of information not based on sound by a variety of non-standard I/O devices.  *See* JX 1, '845 Patent, Figure 1.  A screen phone, which is a type of telephone, is one example of such a device.  *Id.*, '845 Patent at col. 13, lines 13-19).

As the Special Master correctly recognized, "there can be no genuine doubt that digital telephony was known as of June 22, 1995."  *See* Claim Construction R&R at 202.   The Special Master's construction comports with the general knowledge of one skilled in the art at the time of the invention because it acknowledges that a telephone "must have the ability to transmit and receive sound in the form of electrical signals, but if a device has other capabilities as well, that does not preclude such a device from being a 'telephone.'"   *Id.* at 203. Additionally, the Special Master's construction is consistent with the specification, which describes one type of telephone – a screen phone – that obviously communicates electrical signals that are not based on sound.   *Id.* at 201-02 (explaining that the specification contains various examples of digital telephony).

Sprint's objections lack any legitimate basis.   For example, Sprint's contention that "the specification does not teach a telephone communicating with electrical signals not based on sound" was flatly rejected by the Special Master. *Id.* at 198-205.  Furthermore, Sprint's assertion that a "telephone" is "distinguished from other types of phones" in the specification lacks any support whatsoever. Dkt. No. 83 at 32.  Indeed, as the Special Master noted, Sprint's contentions with respect to the term "telephone" "stem more out of the exigency of litigation" and are "belied by the specification itself."  *See* Claim Construction R&R at 198, 202. Accordingly, Sprint's objections should be overruled and the Special Master's recommended construction should be adopted.

### D.   The Special Master Properly Construed the Disputed Term "Screen Phone" and Thus Sprint's Objections Should Be Rejected

The Special Master's recommended construction for the disputed claim term "screen phone" correctly comports with how one of ordinary skill in the art would have understood the term in 1995, and thus Sprint's Rule 53 objection is groundless.  The parties proposed constructions of the term "screen phone" are:

| DATASCAPE'S PROPOSED CONSTRUCTION | SPRINT'S PROPOSED CONSTRUCTION | SPECIAL MASTER'S RECOMMENDED CONSTRUCTION |
|---|---|---|
| A non-standard I/O device comprising a telephone with a display screen. | A non-standard I/O device consisting of a telephone with a display screen. | A "screen phone" is "a non-standard I/O device that includes at least a telephone and a display |

| | | screen and may include other components and features." |
| --- | --- | --- |

As the Special Master explained, the issue is whether a "screen phone" may be more than a telephone and a display phone. *See* Claim Construction R&R at 206. Based on the specification of the patents-in-suit and the testimony at the *Markman* hearing, the Special Master properly concluded that a "screen phone," as understood by one of ordinary skill in the art, may include features additional to a telephone and a display screen.

The specification of the patents-in-suit describes screen phones and screen phone terminals as non-standard I/O devices, and recites some specific models of screen phones as exemplary non-standard I/O devices. *See* JX-1, '845 Patent at col. 4, lines 1-9; col. 5, lines 22-27 and 48-53; col. 6, lines 41-46; col. 9 line 60 – col. 10 line 6; col. 13, lines 13-19.   One such exemplary device listed in the specification is the "Phillips screen phone." *See* JX-1, '845 Patent at col. 13, lines 13-19.   At the *Markman* hearing, a Phillips screen phone was entered into evidence. *Markman* Hearing Transcript, 66:25-68:11.   Datascape's expert, Mr. Putnam offered testimony on the device, explaining that it included a telephone, a screen, and a number of other features, including a smart card reader slot, a

memory card slot, and a keyboard. *Markman* Hearing Transcript, 68:12-70:7. In light of this evidence, the Special Master correctly concluded "that there can be no doubt that 'screen phone' would have been understood by one of ordinary skill in the art as combining more than a telephone and a display screen," and thus the Special Master's recommended construction is appropriate. *See* Claim Construction R&R at 212.

Sprint's contention that the Special Master's recommended construction is "overbroad in that it allows for the inclusion of any 'other components and features' seemingly without limitation" is baseless. Dkt. No. 83 at 34. The construction recommended by the Special Master is based precisely on the specification, which includes a specific screen phone model that clearly included features and components additional to a telephone and display screen. Sprint's attempt to impose a construction of the term "screen phone" that is narrower than the term's ordinary meaning is improper, and therefore Sprint's objections should be overruled. *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 808 (Fed. Cir. 2007).

### E. The Special Master Properly Declined to Construe Several Phrases From the Patents-in-Suit

Defendant Sprint makes substantially identical objections to the Special Master's recommended constructions of the following three claim phrases:

- "tags for identifying one of said I/O devices and input operation to be performed with said one of said I/O devices;"

- "action attributes for defining said identified device operation to be performed with a local resource for one of said I/O devices;" and

- "method attributes for defining a data transfer method for providing data between said server and said I/O device."

Sprint's primary objection appears to concern the Special Master's decision to construe only the component terms of the phrases, and not the entire phrases as a whole. Dkt. No. 83 at 35, 37, 38. According to Sprint, "without a complete definition of the phrase, interpreting it by its component terms will only lead to more confusion and necessitate further briefing." *See, e.g., id.* at 35-36 (emphasis in original). However, it was within the Special Master's discretion to decline to construe the entire phrases as a whole, particularly because the phrases can clearly be understood by reference to the constructions for their component terms.

With respect to Sprint's other objections to the Special Master's recommended constructions of these phrases, Sprint contends that the phrases should be tied to preferred embodiments or examples described in the specification. Dkt. No. 83 at 36, 37, 39. Sprint's argument constitutes an improper attempt to import limitations from the specification into the claims, and is directly contrary to Federal Circuit precedent. *See, e.g., Abbott Labs.*, 566 F.3d at 1288 ("When consulting the specification to clarify the meaning of claim terms, courts

must take care not to import limitations into the claims from the specification.");
*see also* Claim Construction R&R at 297-302 (explaining that Sprint's proffered
constructions inappropriately attempt to limit the disputed terms to preferred
embodiments of the invention).   Accordingly, Sprint's objections should be
overruled and the Special Master's recommended constructions adopted.

### F.    The Special Master's Recommended Constructions Do Not Impermissibly Broaden the Scope of Disputed Claim Terms

Defendant Sprint makes substantially identical objections to the Special
Master's recommended constructions of the following disputed terms:

- "data;"

- "web server;"

- "computer;"

- "coupled/coupling;" and

- "extended [open network protocol/internet protocol/HTTP/HTML] statements"

Specifically, Sprint asserts that the "Special Master's construction[s] should be
rejected because, under the Federal Circuit's teachings, courts should not broaden
the scope of the claims beyond what is taught by the patent specification."  Dkt.
No. 83 at 40, 41, 42, 43, and 45.   Sprint's objections lack justification and
essentially amount to an attempt to impermissibly limit the claims to specific

examples or embodiments described in the specification.  *See Acumed*, 483 F.3d at 808 ("[L]imitations from the specification are not to be read into the claims.").

The Special Master's recommended claim constructions for the above-listed terms are properly based on the intrinsic evidence of record, including the specification of the patents-in-suit.  Moreover, the recommended constructions do not improperly limit the scope of the claims to specific embodiments.  *See, e.g.,* Claim Construction R&R at 164-184 and 213-260; *id.* at 220-21 (discussing the construction of "web server," the Special Master notes that "the specification clearly refers to a 'preferred embodiment,'" but also notes that the specification "clearly notes that other protocols may be used").  Thus, contrary to Sprint's assertion that the recommended constructions are overly broad, the Special Master's recommendations comport with what one of ordinary skill would have understood as the ordinary and customary meaning of the claim terms in light of the specification.  *Acumed*, 483 F.3d at 808 (noting that it is improper to impose constructions that narrow a term's ordinary meaning).  Accordingly,  Sprint's objections should be overruled.

## G. The Special Master Correctly Construed the Disputed "Client Program . . ." Phrases

Despite the fact that Defendant Sprint agrees to the construction of "client program" and does not dispute that the term "client program" provides sufficient

structure when used in six claim terms in which the term "client program" appears (*e.g.*, "client program for processing extended open network statements so that said first non-standard I/O device may communicate with said server"; *see* Claim Construction R&R at 281-282 for a listing of the agreed constructions), Sprint contends that the Special Master's recommended constructions for the following nine "client program . . ." phrases must be rejected because these phrases should be construed as means-plus-function limitations:

- "client program for communicating data with the telephone and for processing extended Internet protocol statements to support communication with the telephone over an open network;"

- "client program for communicating data in an extended Internet protocol between the Web server program and the telephone;"

- "client program for processing extended Internet protocol statements so that the telephone may communicate with the web server;"

- "client program for communicating data in an extended Internet protocol between the Web server program and the telephone, the extended network including one identifier for the telephone for a transaction and identifier for an operation to be performed with the identified telephone;"

- "client program for communicating with said server in an extended open network protocol for communicating data between non-standard I/O devices and said server;"

- "client program for communicating data in an extended Internet protocol between the Web server program and the PDA;"

- "client program for processing extended Internet protocol statements so that the PDA may communicate with the Web server;"

- "client program for communicating data in an extended Internet protocol between the Web server program and the PDA, the extended network protocol including on identifier for the PDA for a transaction and identifier for an operation to be performed with the identified PDA;" and

- "client program for communicating data in an extended open network protocol between said server program and said non-standard I/O device, said extended network protocol including one identifier for the non-standard I/O device for a transaction and identifier for an operation to be performed with said identified non-standard I/O device."

Specifically, Sprint argues that because "[e]ach of these phrases relate to the use of extended protocols for communicating with non-standard I/O devices. . . . [A]t the time of the invention, the claim limitation did not have a 'reasonably well understood meaning in the art.'" Dkt. No. 83 at 53. Thus, each of these phrases "recite insufficient structure" and "should be construed as means-plus-function limitations according to §112(6)." *Id.*

Yet again, Sprint repeats the same argument that was addressed – and rejected – by the Special Master. *See* Claim Construction R&R at 283-285. A proper analysis must begin by noting that none of the claim terms use the word "means." If the word "means" is not used in a claim term, the term is

presumptively not to be construed under §112(6).  *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703-04 (Fed. Cir. 1998).  The Federal Circuit emphasizes that "the use of the term 'means' is central to the analysis" of whether a claim is to be construed in accordance with §112(6).  *Personalized Media*, 161 F.3d at 703; *see also*, *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (discussing the ramifications of the fact that "the use of the term 'means' has come to be so closely associated with 'means-plus-function' claiming").

In addressing this far-fetched argument, the Special Master noted that "when a limitation does <u>not</u> use the word 'means,' that signals an intent <u>not</u> to invoke §112(6), and the question is whether the presumption has been overcome."  *Id.* at 283; *see also Apex, Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) (explaining that to overcome the presumption, the party asserting that a term should be construed under §112(6) must show that the claim term does not have "a ***reasonably well understood meaning in the art***" (internal quotations omitted) (emphasis added)).  The Special Master analyzed the claim terms at issue and determined that Sprint did not rebut the presumption.  *Id.* at 284 ("[W]hether there was a 'reasonably understood meaning in the art' for 'extended protocols for communications with non-standard I/O devices' is not the question.").  Focusing

on the agreed upon constructions and the "client program . . ." phrases in dispute, the Special Master reasoned that the analysis is whether the structure, *i.e.,* the client program, had a reasonably well understood meaning in the art.  *Id.* at 284 ("The recited 'structure' for performing the function was a 'client program,' and the parties agree that recites sufficient structure for performing related or comparable functions . . .").

Sprint agrees to the construction of "client program," and Sprint agrees that six similar phrases, which include the "client program" term, "should not be construed as means-plus-function limitations under §112(6), but rather should be construed by their component terms."  *Id.*  Thus, with respect to the nine "client program . . ." phrases in dispute, Sprint's "arguments are simply misplaced" and Sprint has failed to rebut the presumption that the above-listed "client program . . ." phrases do not invoke §112(6).  *Id.* at 285; *see also Watts v. XL Sys., Inc.*, 232 F.3d 877, 881 (Fed. Cir. 2000) (refusing to find the presumption rebutted when the claim term "recites or refers to terms that are reasonably well understood in the art as names for structure and which perform the recited function").  The Special Master's recommended claim constructions of the "client program . . ." phrases are proper, and thus Sprint's objections should be overruled.

**H.    The Special Master Properly Construed the Disputed "Means For" Claim Phrases**

Defendant Sprint contends that the Special Master's construction of the following "means for . . ." phrases should be rejected:

- "means for activating a function associated with a hot key of said non-standard I/O device;"

- "means for activating a non-standard I/O device to assign data obtained by a non-standard I/O device to a variable name in a file comprising extended open network protocol statements;"

- "means for activating a non-standard I/O device to assign data obtained by a non-standard I/O device to a variable name in a file comprising extended open network protocol statements;"

- "means for processing extended open network protocol statements contained in a local file associated with said activated function;"

- "means for processing keypad input data received from a keypad of said non-standard I/O device;"

- "means for processing the received extended Internet protocol statements to control operations associated with a telephone;"

- "means for receiving extended open network protocol statements over an open network;"

- "means for receiving extended Internet protocol statements over the Internet;"

- "means for sending a file having said assigned data to a server to perform a data operation;" and

- "means for processing the received extended Internet protocol statements to control operations associated with a personal digital assistant (PDA)."

Specifically, Sprint argues that the Special Master's recommended constructions for the "means for . . ." phrases identify corresponding structures that are "far too general to permit one of ordinary skill in the art to know and understand what structure corresponds to the means limitation," and are "overbroad in that the flow charts referenced in his construction contain many more functions than the claimed function allows." Dkt. No. 83 at 54, 56, 57, 58-59, 60, 61, 63, 64, 65-66, and 67.

In *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999), the Federal Circuit explained that "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *Id.* at 1348. In finding corresponding structure for a means-plus-function element that may be implemented in software running on a computer, "[t]he structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm." *Id.* In *WMS Gaming*, the court found that the algorithm was limited to that disclosed in a figure in the patent. *Id.* Similarly, here, the corresponding structure of each means-plus-function phrase at issue is a client program executing, in a processor in an I/O device, those algorithms set forth in the specification that, when carried out, perform the claimed function.

To the contrary, Defendant Sprint's effort to explain the structure in words is inconsistent with the legal precedent related to means-plus-function claim terms. In addition, Sprint's proposed language for the algorithms does not accurately capture them and does not allow for equivalents. Furthermore, Defendant Sprint's proposed constructions are inconsistent with the parties' agreed construction of "client program." Sprint seeks nothing more than to improperly limit the structure to having a "physical connection" where no such limitation is present in the claim terms or disclosed algorithms.

In his report, the Special Master thoroughly addressed the construction of the ten "means for . . ." phrases and properly determined that the corresponding structure of each means-plus-function phrase at issue is a "client program executing in a processor in an I/O device the algorithm" set forth in the corresponding flowchart(s) of the specification that, when carried out, performs the claimed function. *See* Claim Construction R&R at 305-369. Adhering to and properly applying Federal Circuit claim construction principles, the Special Master noted that the "Federal Circuit has long held that '[p]recedent and practice permit a patentee to express that procedural algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.'" *Id.* at 321 (quoting *Typhoon Touch*

*Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)) (internal quotations omitted)).

The Special Master in his analysis repeatedly addressed Sprint's argument that the identified flow chart(s) disclose more functions than the claimed function. For example, the Special Master pointed out that "it is the specification that explains that while Fig. 4 illustrates 'the high level processing of the client program . . .,' the other figures illustrate the algorithm in more detail." *Id.* With respect to Sprint's arguments that the recommended corresponding structures are so general that "no one of ordinary skill could figure out which structure goes with each function," the Special Master properly noted that those are "invalidity arguments" and addressed those in detail in his Report and Recommendation regarding Sprint's motion for summary judgment of invalidity (Dkt. No. 72). *Id.*

Accordingly, Sprint's objections to the Special Master's recommended claim constructions for the "means for . . ." phrases should be rejected, and the Special Master's well-reasoned recommended constructions should be adopted.

## IV.   CONCLUSION

For the reasons set forth above, as well as those specified in Datascape's claim construction briefing (Dkt. Nos. 40 and 45, incorporated herein by

reference), at the *Markman* hearing, and in the Special Master's Report and Recommendation on Claim Construction (Dkt. No. 71), Plaintiff Datascape respectfully requests that the Court overrule Defendant Sprint's objections to Special Master Peterson's recommended claim constructions. Datascape also respectfully requests that the Court adopt the Special Master's recommended constructions, as outlined in *Datascape's Motion to Adopt, and For Modification of, The Special Master's Recommended Claim Constructions* (Dkt. No. 80).

This the 20th day of February, 2012.

**ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.**

*/s/A. James Anderson*
A. James Anderson
Georgia Bar No. 016300
J. Scott Culpepper
Georgia Bar No. 200950
Tara S.G. Sharp
Georgia Bar No. 623320
Elizabeth V. Thomas
Georgia Bar No. 624263
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
One Atlantic Center
1201 West Peachtree Street, N.W., Suite 2200
Atlanta, Georgia 30309
Telephone:  404-760-4300
Facsimile:  404-233-1267
Email:  ajanderson@rkmc.com
Email:  jsculpepper@rkmc.com
Email:  tgsharp@rkmc.com
Email:  evthomas@rkmc.com

Marla R. Butler
Georgia Bar No. 099917
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
601 Lexington Avenue, 34th Floor
New York, NY  10022-1240
Telephone:  212-980-7400
Facsimile:  212-980-7499
Email:  mrbutler@rkmc.com

***Attorneys for Plaintiff Datascape, Inc.***

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this pleading complies with L.R. 5.1C, N.D. Ga.

Dated: February 20, 2012
         */s/A. James Anderson*      ___
         A. James Anderson
         Georgia Bar No. 016300
         J. Scott Culpepper
         Georgia Bar No. 200950
         Tara S.G. Sharp
         Georgia Bar No. 623320
         Elizabeth V. Thomas
         Georgia Bar No. 624263
         ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
         One Atlantic Center
         1201 West Peachtree Street, N.W., Suite 2200
         Atlanta, Georgia 30309
         Telephone:  404-760-4300
         Facsimile:  404-233-1267
         Email:  ajanderson@rkmc.com
         Email:  jsculpepper@rkmc.com
         Email:  tgsharp@rkmc.com
         Email:  evthomas@rkmc.com

         Marla R. Butler
         Georgia Bar No. 099917
         ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
         601 Lexington Avenue, 34th Floor
         New York, NY  10022-1240
         Telephone:  212-980-7400
         Facsimile:  212-980-7499
         Email:  mrbutler@rkmc.com

         ***Attorneys for Plaintiff Datascape, Inc.***

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DATASCAPE, INC., | ) | |
|     a Georgia Corporation, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action File No.: |
| | ) | 1:09-CV-0136-CC |
| SPRINT SPECTRUM, L.P. | ) | |
|     a Delaware Limited Partnership, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| SPRINT SOLUTIONS, INC. | ) | |
|     a Delaware Corporation, | ) | |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2012, I electronically filed the foregoing *Plaintiff Datascape, Inc.'s Response to Defendants Sprint Spectrum, L.P. and Sprint Solutions, Inc.'s Objections to the Special Master's Report and Recommendation On Claim Construction Regarding U.S. Patent Nos. 5,742,845, 5,905,908, 6,366,967, 6,684,269, and 6,745,259* with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Steven W. Hardy, Esq.            Erick P. Wolfe, Esq.
Steven W. Hardy, LLC             Wang, Hartmann, Gibbs & Cauley
800 Johnson Ferry Road, N.E.     1301 Dove Street, Suite 1050
Atlanta, GA  30342               Newport Beach, CA  92660

John van Loben Sels, Esq.
Wang, Hartmann, Gibbs & Cauley
2570 West El Camino Real, Suite 440
Mountain View, CA  94041

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

*/s/A. JamesAnderson*                         _
A. James Anderson
Georgia Bar No. 016300
J. Scott Culpepper
Georgia Bar No. 200950
Tara S.G. Sharp
Georgia Bar No. 623320
Elizabeth V. Thomas
Georgia Bar No. 624263

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
One Atlantic Center
1201 West Peachtree Street, N.W., Suite 2200
Atlanta, Georgia 30309
Telephone:  404-760-4300
Facsimile:  404-233-1267
Email:  ajanderson@rkmc.com
Email:  jsculpepper@rkmc.com
Email:  tgsharp@rkmc.com
Email:  evthomas@rkmc.com

Marla R. Butler
Georgia Bar No. 099917
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
601 Lexington Avenue, 34th Floor
New York, NY  10022-1240
Telephone:  212-980-7400
Facsimile:  212-980-7499
Email:  mrbutler@rkmc.com

*Attorneys for Plaintiff Datascape, Inc.*